IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

United States of America

     v.                           Case No. 2:17-cr-169

Gregory Schnabel

<u>OPINION AND ORDER</u>

     Defendant was charged by information with three counts of conspiracy to submit false claims for biodiesel mixture credits, alternative mixture credits and alternative fuel credits in violation of 18 U.S.C. §371.  Defendant and the government entered into a plea agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C), which called for a binding sentence of 63 months.  By judgment entered on August 27, 2018, defendant was sentenced to terms of incarceration of 60 months on Counts 1 and 2, to run concurrently, and to a term of incarceration of 3 months on Count 3, to run consecutively.  The terms of incarceration were to be followed by a three-year term of supervised release on each count, to run concurrently.  Defendant was also ordered to pay restitution in the amount of $13,017,793 to the Internal Revenue Service ("IRS"), and $13,226,644.06 to Murex LLC, for a total restitution obligation of $26,244,437.06.  The court permitted defendant to self surrender to the institution after November 12, 2018.  He has been incarcerated approximately 19 months.  His projected release date is May 4, 2023.

     On April 15, 2020, defendant filed an emergency motion for a reduction of sentence pursuant to 18 U.S.C. §3582(c)(1)(A), as amended by the First Step Act of 2018, relying primarily on the risks posed by the COVID-19 pandemic.  Doc. 44.  The government has filed a memorandum in opposition to the motion.  Doc. 47.  The

government's motion to extend the time to file a response (Doc. 46) is granted.  Defendant's motions to supplement the record (Docs. 50, 51 and 52) are granted.

I. Standards for Reduction in Sentence under §3582(c)(1)(A)

A. In General

Under §3582(c)(1)(A), the court may reduce a sentence of imprisonment upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of a defendant after that defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to file such a motion on a defendant's behalf, or after thirty days have passed since the warden's receipt of defendant's request.[1]  The government does not contest that defendant has exhausted his administrative remedies, and has addressed defendant's motion on the merits.  Doc. 47, p. 2, n. 1.

If the defendant's administrative remedies have been exhausted, the court can reduce a sentence under §3582(c)(1)(A) if the court finds that "extraordinary and compelling reasons warrant such a reduction[.]" 18 U.S.C. §3582(c)(1)(A)(i).  Before granting a reduction based on extraordinary and compelling reasons, the court must also find "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]" 18 U.S.C. §3582(c)(1)(A).  The court is also required to consider the factors set forth in 18 U.S.C. §3553(a) to the extent that they are applicable.  §3582(c)(1)(A).  If the court decides that the motion is well taken, the court "may reduce the

---

[1]This exhaustion requirement is not jurisdictional, but is a mandatory condition which must be enforced if the government timely objects to the failure to exhaust.  United States v. Alam, 960 F.3d 831, 833-834 (6th Cir. June 2, 2020).

2

term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment)[.]" §3582(c)(1)(A).   The grant of compassionate release is at the discretion of the court.   United States v. Kincaid, 802 F. App'x 187, 188 (6th Cir. April 23, 2020).

B. Sentencing Commission Policy Statement

The Sentencing Commission has issued a policy statement regarding the reduction of a term of imprisonment under §3582(c)(1)(A).   See United States Sentencing Guidelines ("U.S.S.G.") §1B1.13.  Under §1B1.13, a reduction may be ordered if extraordinary and compelling reasons warrant a reduction, the defendant is not a danger to the safety of any other person or to the community, and the reduction is consistent with the policy statement.   §1B1.13(1)(A), (2) and (3).

Under Commentary Note 1(A) to §1B1.13, extraordinary and compelling reasons exist where: (i) the defendant is suffering from a terminal illness, that is, a serious and advanced illness with an end of life trajectory; or (ii) is suffering from a serious physical or medical condition, a functional or cognitive impairment, or deteriorating physical or mental health because of the aging process that substantially diminishes the defendant's ability to provide self-care within the environment of a correctional facility and from which he is not expected to recover. U.S.S.G. §1B1.13 cmt. n. 1(A).

Commentary Note 1(B) to §1B1.13 states that extraordinary and compelling reasons exist when the defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental

health because of the aging process, and has served at least 10 years or 75 percent of his sentence, whichever is less. U.S.S.G. §1B1.13 cmt. n. 1(B).

Under Commentary Note 1(C), family circumstances can constitute grounds for a reduction, specifically: (i) the death or incapacitation of the caregiver of the defendant's minor child or minor children, and (ii) the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner. U.S.S.G. §1B1.13 cmt. n. 1(C).

Commentary Note 1(D) states that other reasons for a reduction of sentence may be shown when, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. §1B1.13 cmt. n. 1(D).

C. Other Reasons Determined by the Director of the BOP

As to Note 1(D), the BOP has issued Program Statement No. 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g) (Jan. 17, 2019), https://www.bop.gov/policy/progstat/5050_050_EN.pdf, which lists factors which the BOP uses in determining whether extraordinary and compelling reasons exist for compassionate release. Program Statement No. 5050.50 authorizes the filing of a request for a sentence reduction for substantially the same reasons outlined in Application Note 1(A)-(C) of §1B1.13. The Program Statement addresses requests for a reduction in sentence based on: a terminal medical condition with a life expectancy of 18 months or

4

less or an end-of-life trajectory, see Section 3(a); or a debilitated medical condition due to an incurable progressive illness or debilitating injury from which they will not recover, see Section 3(b). Section 4 authorizes a reduction for inmates age 70 or older who have served 30 years or more, see Section 4(a), inmates age 65 or older who suffer from certain medical conditions and who have served at least 50 percent of their sentence, see Section 4(b), and inmates age 65 or older who have served the greater of 10 years of 75 percent of the term of imprisonment, see Section 4(c). Section 5 permits consideration of a reduction in sentence request based upon the death or incapacitation of the family member caregiver of an inmate's child under the age of 18. Section 6 authorizes the filing of a request based on the incapacitation of an inmate's spouse or registered partner when the inmate would be the only available caregiver for the spouse or registered partner.

In entertaining a request for a reduction in sentence, the warden must also consider a list of factors, including the nature and circumstances of the offense, the inmate's criminal and personal history, institutional adjustment and disciplinary infractions, the length of the sentence and the amount of time served, the current age of the inmate and the inmate's age at time of offense and sentencing, the inmate's release plans, and whether release would minimize severity of offense. Program Statement 5050.50, Section 7.

Because the Guidelines have not been amended since the enactment of the First Step Act due to the lack of a quorum on the Sentencing Commission, some courts have concluded that district

courts also have the authority under subsection (D) to determine if other extraordinary and compelling reasons exist, and that the Director's prior interpretation of "extraordinary and compelling reasons" is informative but not dispositive. See, e.g., United States v. Cantu, 423 F.Supp.3d 345, 350-352 (S.D. Tex. 2019); United States v. Brown, 411 F.Supp.3d 446, 449-451 (S.D. Iowa 2019).

Other courts have concluded that Application Note 1(D) continues to apply, and that the court must look to the reasons recognized by the Director of the BOP. See, e.g., United States v. Saldana, 807 F. App'x 816, 819-20(10th Cir. 2020)(basing decision on the §1B1.13 policy statements, the BOP Program Statement 5050.50, and the §3553(a) statutory sentencing factors); United States v. Hall, No. 5:98-cr-7-JMH, 2019 WL 6829951, at *3-4 (E.D.Ky. Dec. 13, 2019)(for purposes of §1B1.13 Commentary Note 1(D), BOP Director has defined "other reasons" in Program Statement 5050.50); United States v. Crawford, No. 1:07CR317-1, 2019 WL 6615188, at *4-5 (M.D.N.C. Dec. 5, 2019)(applying Commentary Notes (1)(A) and (B) and the BOP Program Statement in denying a reduction based on defendant's medical conditions).

In United States v. Washington, Criminal Action No. 5:13-020-DCR, 2019 WL 6220984, at *1-2 (E.D.Ky. Nov. 21, 2019), reconsideration denied, 2020 WL 1873550 (Apr. 14, 2020), the court declined to follow Cantu and concluded that district courts are not free to grant compassionate release based on any reason they find to be "extraordinary and compelling." That court also noted 28 U.S.C. §994(t), which delegates to the Sentencing Commission the duty to describe what should be considered extraordinary and

compelling reasons for a sentence reduction under §3582(c)(1)(A), "including the criteria to be applied and a list of specific examples." 28 U.S.C. §994(t).

## II. Defendant's Request for Compassionate Release

## A. Request to the Warden

In his March 26, 2020, letter to the warden, counsel requested a reduction in sentence on defendant's behalf based on the risks posed to inmates by the COVID-19 pandemic. Doc. 44, Ex. C. Defendant claimed to be in a high risk group due to his age (51), his family's genetic predisposition to acute familial cardiopathy, essentially a hole in the heart, with which he is possibly afflicted, and a childhood diagnosis at a young age of activity-induced asthma (although defendant has not used an inhaler for many years). If released, defendant proposed to reside with his partner, Rebecca Morgan, and their four children in the Walton, New York area. Counsel reported that defendant had adjusted well to prison life, had taken several classes, and had incurred three minor infractions for having too many books and extra bedding, and having more bananas than permitted. He noted that two companies engaged in conduct similar to defendant's offenses were prosecuted in civil cases.[2]

---

[2]Defendant also requested in the alternative that the warden permit him to serve the remainder of his sentence on home confinement pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), §12003(b)(2), and the Attorney General's declaration authorizing the BOP director to grant home confinement sooner than would otherwise be allowed under 18 U.S.C. §3624(c). Only the BOP has the authority to place a defendant on home confinement under the CARES Act. United States v. Daniels, No. 4:08-CR-0464-SLB, 2020 WL 1938973 at *1-2 (N.D. Ala. Apr. 22, 2020).

In his April 28, 2020, response denying defendant's request for a reduction in sentence motion, the warden noted that the review of defendant's medical records by Health Services revealed no diagnosis of acute familial cardiomyopathy or asthma, and that defendant reported no existing or pre-existing medical conditions upon intake screening at FCI Otisville.  The warden concluded that there was no evidence that defendant has a current or previous medical condition that would put him at risk of serious illness if exposed to COVID-19.  Doc. 47-1.

B. Current Motion

Defendant now pursues a motion for compassionate release in this court.  In his motion, defendant asks this court to convert the remainder of his term of imprisonment to a term of home confinement.  This court cannot order that the defendant serve the remainder of his term of incarceration at his residence, as the BOP has the sole authority to designate the place of a prisoner's imprisonment.  18 U.S.C. §3621(b); United States v. Townsend, 631 F. App'x 373, 378 (6th Cir. 2015).  However, §3582(c)(1)(A) would permit this court to reduce defendant's term of imprisonment to one of time served and to impose a new term of supervised release equal to the unexpired term of incarceration, with a condition of home confinement, to be followed by the previously imposed three-year terms of supervised release.

III. Extraordinary and Compelling Reasons

A. Release Due to Family Circumstances

Defendant argues that a sentence reduction is warranted due to his family circumstances, specifically, the health of his 75-year-old mother.  Defendant has submitted letters and medical records

8

indicating that Renee Schnabel suffers from hypertension, asthma, emphysema, hypertension, obesity, and cardiac problems which resulted in the installation of a pacemaker. Doc. 44, Exs. D-H. Mrs. Schnabel resides in New York City, and has expressed her concern for defendant's health in light of COVID-19. Defendant argues that the mental distress caused by defendant's incarceration is significant due to her other physical ailments. In his reply memorandum, defendant also submitted a letter from defendant's partner, Rebecca Morgan, who wrote concerning the emotional trauma defendant's incarceration has inflicted on his family. Doc. 48, Ex. H.

The health concerns of defendant's mother and the effects of defendant's incarceration on his family do not qualify as extraordinary and compelling reasons for a sentence reduction under Commentary Note 1(C), which refers only to the death or incapacitation of the caregiver of the defendant's minor child or minor children and the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner. Similarly, Program Statement 5050.50, Section 5, permits consideration of a reduction in sentence request based upon family circumstances consisting of the death or incapacitation of the family member caregiver of an inmate's child under the age of 18.

Even assuming that the court can consider the family circumstances outlined by defendant more broadly as "other reasons" for a reduction in sentence under Commentary Note 1(D), the court concludes that these circumstances are not extraordinary and compelling. As another judge of this court noted in <u>United States</u>

v. Ingram, No. 2:14-cr-40, 2019 WL 3162305, at *2 (S.D.Ohio July 16, 2019), many inmates have aging and sick parents. Defendant would not be a caregiver for his ailing mother in New York City if he is released on home confinement, and there is also no evidence that he would be the only available caregiver. Defendant's mother's concerns about defendant's health in light of the COVID-19 epidemic, while understandable, are undoubtedly shared by the families of most inmates, and such concerns do not constitute an "extraordinary and compelling reason" for compassionate release. Likewise, the incarceration of many inmates poses a hardship to their families. The defendant's family circumstances are not extraordinary.

B. COVID-19 Risk and Defendant's Health

1. Standards

Defendant also seeks a reduction in sentence due to the risk posed by the COVID-19 epidemic. Defendant has cited cases in which the courts have granted a sentence reduction due to COVID-19 and the defendant's circumstances even though the defendant was convicted of a serious crime and had served a small percentage of the sentence imposed. The court recognizes that it has discretion to grant a motion for compassionate release. Kincaid, 802 F. App'x at 188. However, §3582(c)(1)(A), as amended by the First Step Act, "does not constitute a get-out-of-jail card." United States v. Brady, S2 18 Cr. 316 (PAC), 2020 WL 2512100, at *3 (S.D.N.Y. May 15, 2020). Rather, "compassionate release motions amid the COVID-19 pandemic have required a 'fact-intensive' inquiry ... made in the 'unique circumstances' and 'context' of each individual defendant." Id., citing United States v. Shakur, No. 82 CR 312

10

(CSH), 2020 WL 1911224, at *1 (S.D.N.Y. Apr. 20, 2020) and <u>United States v. Hart</u>, 17 Cr. 248 (VSB), 2020 WL 1989299, at *6 (S.D.N.Y. Apr. 27, 2020)). Factors courts have considered include the defendants age, the severity and documented history of the defendant's health conditions and the defendant's history of managing those conditions in prison, the status of COVID-19 in the institution, the percentage of the term of incarceration that has been served, and the sentencing factors in §3553(a). <u>Id.</u>

None of the medical information presented by defendant shows that he meets the requirements of Commentary Note 1(A) to §1B1.13. There is no evidence that he is suffering from a terminal illness, that is, a serious and advanced illness with an end of life trajectory; or that he is suffering from a serious physical or medical condition, a functional or cognitive impairment, or deteriorating physical or mental health because of the aging process that substantially diminishes the defendant's ability to provide self-care within the environment of a correctional facility and from which he is not expected to recover. There is no evidence that he has been unable to successfully manage any of his health conditions in prison.

Assuming <u>arguendo</u> that this court can consider health concerns beyond the scope of those noted on Note 1(A), defendant argues that he has health conditions which may prove to be fatal if he contracts COVID-19. He specifically contends that he is at an enhanced risk due to his asthma and a genetic predisposition for a form of heart disease known as familial dilated cardiomyopathy. The court notes that these conditions were not reported to the probation officer who prepared the presentence report.

11

## 2. Past Diagnosis of Asthma

The records show a past diagnosis of asthma. In a letter dated April 15, 2020, Dr. Michael A. Liguori, who has treated the defendant, stated that defendant has a history of asthma, which is now latent, but which could flare up if he were to contract COVID-19. Doc. 44, Exhibit B. However, the request made to the warden indicated that there was a childhood diagnosis at a young age of activity-induced asthma and that defendant has not used an inhaler for many years. There is insufficient evidence that defendant's previous asthma condition would place him at greater risk if he contracts COVID-19.

## 3. Genetic Predisposition to Familial Dilated Cardiomyopathy

Dr. Liguori also stated that defendant has a strong family history of and a genetic predisposition to familial dilated cardiomyopathy, and opined that if defendant were to contract COVID-19, it would likely prove fatal. Dr. Liguori notes defendant's former diagnosis of obesity put a strain on his heart and other organs, and that, although defendant has lost about 100 pounds since being incarcerated, this fluctuation has taken a toll on his body. However, the court concludes that the fact that defendant has lost 100 pounds would be of benefit to his overall health.

Defendant has submitted the death certificate of his maternal great uncle, which shows congestive cardiomyopathy as one cause of death (Doc. 48, Ex. B), and a letter dated February 26, 2016, from Elsa I. Castro, M.D., concerning her treatment of a maternal uncle's granddaughter for a heart murmur (Doc. 48, Ex. C). Dr. Castro also noted in her letter that two cousins of her patient had

been diagnosed with atrial septal defects, and that her maternal grandfather and maternal great-grandfather had a familial form of cardiomyopathy. Defendant has also submitted a letter from Dr. Brian Swirsky, an assistant professor of medicine at Tulane University. Doc. 48, Ex. A. Dr. Swirsky has never examined or treated defendant. He opined that due to defendant's having a strong family history of genetic familial dilated cardiomyopathy, defendant has a marked increased risk of having this disorder, even if it has not been diagnosed. Dr. Swirsky indicated that patients with this condition can be asymptomatic until a concomitant systemic stress such as pneumonia occurs.

Defendant also notes that the Center for Disease Control ("CDC") has advised that older adults and persons with underlying medical conditions are at a higher risk from COVID-19 and need to take extra precautions. See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions.html (last checked June 30, 2020). For example, persons in their fifties are at higher risk for severe illness than younger people, and persons with serious heart conditions such as cardiomyopathies are also at higher risk.

However, there is no evidence that defendant has been diagnosed as currently having dilated cardiomyopathy, or that he has ever shown symptoms of this disease. According to the warden, defendant did not report this familial genetic history upon intake screening at FCI Otisville. Doc. 47-1. There is no evidence that it has been determined through other means, such as DNA testing, that defendant, in particular, is genetically predisposed to developing this condition. Defendant has presented evidence indicating that dilated cardiomyopathy has been known to occur in

13

maternal family members. However, whether defendant has inherited this genetic trait is a matter of speculation. The court notes that although defendant's 75-year-old mother has a medical history of asthma with acute exacerbation, chronic obstructive pulmonary disease, and the installation of a pacemaker, her medical records do not include any reference to dilated cardiomyopathy. See Doc. 44, Exs. D and E. This cannot be explained by the fact that she is a women, as there is no evidence that only males in the family are predisposed to inherit this condition. Rather, defendant has indicated that an uncle's granddaughter has been diagnosed with a heart murmur.

It is unknown whether defendant actually has a genetic predisposition towards developing dilated cardiomyopathy. Defendant is now 51 years of age. While he may have a genetic risk of developing this disease, it is also entirely possible that he does not. Whether he would develop this condition if he contracts COVID-19 is a matter of speculation. He has submitted no medical treatment records of his own which show that he has been diagnosed as having dilated cardiomyopathy, or even that he has reported symptoms indicative of dilated cardiomyopathy. See United States v. Dickson, No. 1:19-cr-251-17, 2020 WL 1904058, at *3 (N.D. Ohio April 17, 2020)(denying motion for compassionate release where defendant produces no medical records to substantiate his claim that he was at a higher risk of contracting COVID-19). The speculative possibility that he may develop dilated cardiomyopathy in the future is insufficient to show that he would be at greater risk if he contracts COVID-19, or to establish extraordinary and compelling reasons for a sentence reduction.

14

## 4. Amount of Time Remaining on Term of Incarceration

He has served approximately 20 months or 30% of his sentence. Defendant submits that if good time credit and his acceptance into the Residential Drug and Alcohol Program are also considered, he has served 50% of his sentence.  At this time, the BOP reports that defendant's projected release date is May 4, 2023.   See https://bop.gov/inmateloc/ (last checked June 25, 2020).  He has a little more than 34 months to serve, which is approximately 54% of the sentence.

## 5. BOP's Management of COVID-19

Defendant has not been placed on home confinement by the BOP. He argues that, despite the authorization granted by Attorney General William Barr to implement the increased eligibility for home confinement authorized under the CARES Act in light of COVID-19, the BOP has been slow to place inmates on home confinement, or to grant furlough requests, thus leading some courts to grant compassionate leave requests.  He notes a BOP report that as of June 22, 2020, courts have granted compassionate release in 650 cases.  However, according the the BOP website, the BOP has placed an additional 4,521 inmates on home confinement.   See https://bop.gov/coronavirus (last checked June 26, 2020).[3] Further, nothing in the CARES Act requires the BOP to release any particular inmate or number of inmates on home confinement.

Defendant has also presented evidence concerning the BOP's ability to effectively address the spread of COVID-19.  Defendant

---

[3]This court can take judicial notice of public records.  New England Health Care Employees Pension Fund v. Ernst & Young, LLP, 336 F.3d 494, 501 (6th Cir. 2003).

has submitted the affidavit of Dr. Brie Williams, a professor of medicine at the University of California, at San Francisco, and a previous consultant to the California Department of Corrections and Rehabilitation.  Doc. 44, Exhibit A.  Dr. Williams discusses the risk posed by COVID-19 to inmates housed in close quarters, in particular inmates age 50 and older.  Dr. Williams opines that jails and prisons are ill-equipped to handle a pandemic, and that prison staff are also vulnerable.  Defendant also cites the report of the Marshall Project, a nonprofit news organization, questioning whether the BOP is accurately reporting the number of COVID-19 cases.

Defendant points to evidence indicating that since the filing of his motion, there has been an increase in COVID-19 cases at FCI Otisville and in BOP institutions in general.  Defendant reports that FCI Otisville has again been placed on lockdown in light of these additional cases.  The court notes the BOP website referenced above, which reports that at FCI Otisville, 11 inmates and 14 staff previously tested positive for COVID-19 and recovered; that there have been no staff or inmate deaths; and that currently 19 inmates and 1 staff member have tested positive.  However, the court also notes that the BOP website also states that this recent data reflects an increase in the number of cases because the "BOP has begun additional testing of asymptomatic inmates to assist in slowing transmissions within a correctional setting."  This indicates that the BOP is now taking additional measures to identify inmates who may have COVID-19 without displaying any symptoms.

The court concludes that this evidence does not establish

16

that the BOP is incapable of competently addressing the threat of COVID-19 in its institutions.  The BOP has implemented a modified operation plan.  See https://bop.gov/coronavirus/covid19-status.jsp (last checked June 25, 2020).  Under this plan, social visits at the institutions are precluded, inmate internal movement has been suspended, staff travel and training has been suspended, enhanced health screening of staff has been implemented, newly arriving inmates are processed through quarantine or jail/detention sites and are screened for COVID, asymptomatic inmates with exposure to risk factors are quarantined, and symptomatic inmates with exposure risk factors are isolated and tested.  Defendant's report that FCI Otisville has been locked down indicates that the BOP is taking steps to address the new

The statistics provided by the BOP as of June 25, 2020, indicate that currently there are 132,087 inmates in BOP facilities, 13,473 inmates in community-based facilities, and approximately 36,000 staff.  See https://bop.gov/coronavirus (last checked June 26, 2020).  To date, 5,115 inmates and 571 staff members have recovered from COVID-19, and there have been 89 inmate deaths and 1 staff member death.  Currently, 1,249 inmates and 133 staff members have positive test results (as noted above, the BOP is now testing asymptomatic inmates).  A few institutions have reported high COVID-19 levels.  For example, at FCI Butler, 104 inmates have recovered from COVID-19, and 587 inmates currently have tested positive.  At FCI Elkton, 572 inmates have recovered, and 125 have currently tested positive.  However, the court also notes that some institutions which had a high number of COVID-19 cases in the past are now reporting substantially lower numbers:

17

FCA Fort Worth reports 575 inmates who have recovered and 31 who currently have tested positive; FCI Forest City reports 660 inmates who have recovered and 30 current inmates with positive tests. The great majority of the institutions included in the BOP statistics have had under ten, or very few COVID-19 cases, and in many instances are reporting zero current cases.

The court also notes that the threat of COVID-19 is not limited to the prison population, but rather has impacted the general population. Although defendant has indicated that he would essentially be self-quarantined at his residence while on home confinement, his partner and children would not be restricted to their residence and could potentially introduce COVID-19 to their home. Delaware County, New York, where defendant's Walton, New York, residence is located, has not escaped the COVID-19 epidemic. On June 25, 2020, the Delaware County Public Health Department reported 82 positive tests, with 26 tests pending, and 6 deaths. See https://delawarecountypublichealth.com/June-25th-2020-delaware-county-covid-19-update (last checked June 26, 2020).[4] Despite geographical and social distancing, there have been more positive test results in Delaware County than the total 45 cases reported to date at FCI Otisville.

C. Conclusion

The court concludes that defendant has not shown that extraordinary and compelling reasons for a sentence reduction exist

---

[4]This court can take judicial notice of the records of state agencies. See Disabled Rights Action Committee v. Las Vegas Events, Inc., 375 F.3d 861, 866 n. 1 (9th Cir. 2004)(citing Kottle v. Northwest Kidney Centers, 146 F.3d 1056, 1064 n. 7 (9th Cir. 1988)(state health department records were properly judicially noticed)).

in his case.  However, even if it is assumed that the above circumstances are extraordinary and compelling, the court must also consider them in light of the statutory sentencing factors.

IV. §3553(a) Factors

The statutory sentencing factors set forth in §3553(a) include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   (B) to afford adequate deterrence to criminal conduct;
   (C) to protect the public from further crimes of the defendant; and
   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for—
   (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
      (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code,....

                    * * *

(5) any pertinent policy statement—
   (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code....

                    * * *

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. §3553(a).

The court has considered the history and characteristics of the defendant.  The court notes that detailed information about the defendant is contained in his sentencing memorandum, which the court has considered.  <u>See</u> Doc. 22.  Additional information concerning defendant and his family is included in the presentence report.  Defendant asserted that he became involved in the charged offenses due to his desire to protect the environment and to promote "green" lifestyles.  He had no criminal record prior to the instant offenses.  He has a Bachelor of Arts degree.  He is in a long-term relationship.  He has been a good father to his four children and has a supportive family.  His incarceration has resulted in a hardship to his family.

As to the nature of the offense, this case involved three conspiracies.  The conspirators engaged in a scheme to generate false renewable identification numbers (RINS").  These serial numbers are assigned to batches of biofuel.  They may be purchased by petroleum producers and used as tax credits to satisfy their renewable fuel quotas.  Count 1 involved a conspiracy from July, 2011, to March, 2012, between defendant and Dean Daniels of Chieftain Biofuels and William Bradley of New Energy Fuels, LLC. Defendant participated in this conspiracy to make false claims to the IRS for tax credits using invalid RINs.  Count 2 alleged a conspiracy from September, 2011, to May, 2012, with Malek Jalal of Unity Fuels to assert false claims for biodiesel mixture credits, alternative mixture credits and alternative fuel credits.  Count 3 charged that defendant participated in a conspiracy from March, 2012, to March, 2015, with Fred Witmer and Gary Jury of Triton

20

Energy to make false claims for alternative fuel credits.

Defendant characterizes his conduct as being the result of his naive lack of education, training or experience in the complicated regulatory scheme governing biofuels. See Doc. 44, p. 3. However, the probation officer properly applied an enhancement for the use of sophisticated means in this case, an enhancement to which the defendant did not object. This case involved continuing illegal activity spanning over a period of almost four years which impacted more than ten victims. The conspiracies were carried out through complex and intricate offense conduct. The presentence report states that a variety of sophisticated means were used to commit the offenses, such as including false information in contracts to fool an unsuspecting customer, buying and selling the same oil from and to Unity Fuels, and relocating a fuel production operation from New Energy Fuels in Texas to Chieftain Biofuels in Ohio to avoid detection of the fraud by RIN purchasers.

In accepting the binding sentence agreement, the court considered the guideline range, which was 87-108 months. The agreed sentence of 63 months was substantially below that range. The court concluded that the agreed sentence took the defendant's background and characteristics into account, avoided sentencing disparities between co-conspirators, and was sufficient, and no more severe than necessary, to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, and to protect the public from further crimes of the defendant without being more severe than necessary. Defendant has served less than half his term of incarceration, which was substantially lower than the

21

bottom of the guideline range.  The reduction in sentence sought by defendant would not be sufficient to serve the aforementioned goals of sentencing.

V. Conclusion

The court has concluded that the evidence in the record does not establish the existence of "extraordinary and compelling reasons" which warrant a sentence reduction in this case.  However, the court has also, in the alternative, considered the totality of the circumstances and weighed them in light of the statutory sentencing factors.  Defendant's proffered reasons for a reduction in sentence are outweighed by the need for him to serve a term of incarceration which is sufficient to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, and to protect the public from further crimes of the defendant.  The defendant's emergency motion for a reduction in sentence (Doc. 44) is denied.

Date: July 1, 2020                    _____s/James L. Graham_____
                                      James L. Graham
                                      United States District Judge